IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNIVERSITY OF WISCONSIN HOSPITAL
AND CLINICS, INC., and UNIVERSITY OF
WISCONSIN MEDICAL FOUNDATION,
INC.,

Plaintiffs,                                          OPINION AND ORDER

v.                                                        14-cv-803-wmc

AIR PRODUCTS AND CHEMICALS, INC.,
AS SUCCESSOR PLAN ADMINISTRATOR
TO EPCO CARBON DIOXIDE PRODUCTS,
INC., HEALTH PLAN,

Defendant.

After consuming a number of alcoholic drinks, Brennan Cain fell down the
basement stairs of his sister's house in the early morning hours of December 25, 2010.
Despite receiving extensive treatment at the University of Wisconsin Hospital, Cain
tragically died from injuries resulting from that fall. In an initial lawsuit before this
court, plaintiffs University of Wisconsin Hospital and Clinics, Inc. and University of
Wisconsin Medical Foundation, Inc. (collectively, "UWHC"), as assignees of his claims
for reimbursement, challenged the decision by the administrator of his employee health
benefits plan to deny coverage for Cain's injuries.[1] *See Univ. of Wis. Hosps. & Clinics
Auth. v. EPCO Carbon Dioxide Prods., Inc. Health Care Plan*, No. 12-cv-031-wmc, slip op.
(W.D. Wis. Apr. 18, 2015). In that case, the court remanded the administrator's
decision for reconsideration, finding that the original denial under the coverage exclusion

---

[1] Defendant does not challenge plaintiffs' right to stand in the shoes of its insured.

for "accidental bodily Injury sustained or Illness contracted as a result of alcohol or drug use" was arbitrary and capricious absent an investigation and ruling out of possible causes for Cain's fall and resulting injuries other than alcohol intoxication. (*Id.*, dkt. #52.) In this case, plaintiffs again challenge the denial of their claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, this time naming as defendant the administrator of the plan's successor, defendant Air Products and Chemicals, Inc. ("Air Products").[2]

Before the court are plaintiffs' motion for judgment on the pleadings (dkt. #12), defendant's motion for summary judgment (dkt. #18), and plaintiffs' motion for partial summary judgment (dkt. #32). Based on the undisputed facts, the court finds that the plan administrator has now sufficiently investigated the possible causes of Cain's fall. The court further finds that the administrator reasonably interpreted and applied the facts to the relevant coverage exclusion. Accordingly, the plan's denial of coverage was not arbitrary and capricious, and the court will grant summary judgment to defendant.

---

[2] Jurisdiction is proper in this court under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Because the alleged denial of benefits occurred in the Western District of Wisconsin, venue is also proper under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2). This decision is being issued long after the filing of the pending motions due to an oversight, which was thankfully recently pointed out by counsel for the plaintiff (dkt. #44) and for which the court apologizes sincerely.

UNDISPUTED FACTS[3]

## A.    The Plan

On December 25, 2010, Brennan Cain was an employee of EPCO Carbon Dioxide Products, Inc. ("EPCO") and an employee-participant of the EPCO Employee Health and Welfare Plan (the "Plan"). After acquiring EPCO, Air Products became the administrator of the Plan. Accordingly, Air Products handled Cain's claim on remand.

The Plan grants its administrator, Ms. Elizabeth Reese, "sole authority and discretion to interpret and construe the terms of the Plan and to determine any and all questions in relation to . . . payment of benefits or claims under the Plan[.]"

## B.    The injury

The afternoon of December 24, 2010, Cain worked at EPCO for a total of six hours. Somewhere between 6:30 and 7:00 p.m., Cain and his girlfriend, Beth Sutton, arrived at his sister and brother-in-law's house. That night, Cain and Sutton went to two bars with his sister and brother-in-law, Temple and Patrick Palmer, before returning home sometime between 11:00 p.m. and midnight.

Around 12:30 a.m. on December 25, 2010, Cain went to the basement to sleep. Having consumed "several" alcoholic drinks, Sutton recalled that he was "staggering a little bit at that time." At approximately 2:30 a.m., Cain returned upstairs to convince

---

[3] From the parties' complaint, answer, proposed findings of facts and responses, evidentiary submissions (to the extent not contradicted) and the Administrative Record ("AR") (dkt. #17), the court finds the following facts undisputed for the purpose of deciding the present motions.

Sutton to come to bed.[4]  She followed Cain to the basement stairs, but as he stepped down from the threshold, Cain lost his balance, fell down the stairs and landed on the floor, knocking himself unconscious.  Cain received emergency medical treatment on the scene and was then rushed to the University of Wisconsin Hospital.  There, he underwent treatment for Level I head trauma, but never recovered.  Cain passed away at the hospital due to his injuries on October 5, 2011.

At the time he fell down the stairs, Cain was wearing slippers with rubber soles.  There were no objects lying on the stairs, although the first step leading down into the basement was shorter than the rest, with a height of approximately three to four inches.  At 4:21 a.m., the hospital measured Cain's blood alcohol content ("BAC"), which was still 0.25g/dL, or roughly three times the legal driving limit in Wisconsin.[5]

After Cain presented his claim for reimbursement, a third party claim manager, Cottingham & Butler, reviewed the emergency room report and ruled out a stroke as the cause of his fall.  Eric Wiesemann, the administrator of the plan at that time, then denied Cain's claim under General Limitation 52, which excludes coverage for "accidental bodily Injury sustained . . . as a result of alcohol or drug use."  In anticipation of litigation, the

---

[4] According to the parties in the first lawsuit, Sutton and Temple Palmer thought that Cain appeared sleepy but not obviously intoxicated when he came upstairs, as he was steady on his feet and did not slur his speech.  *EPCO*, No. 12-cv-031-wmc, at *3.

[5] Plaintiffs dispute the value of Cain's BAC by pointing out that the hospital measured his "alcohol serum concentration" at 250 mg/dL.  Since one can apparently move the decimal point three places to the left in order to convert a measure of alcohol serum concentration to BAC, Cain would still appear to have had a .25g/dL BAC.  *See* Preeti Dalawari, *Ethanol Level*, Medscape, (Feb. 4, 2014), http://emedicine.medscape.com/article/2090019-overview.  In any event, because plaintiffs do not provide any further explanation as to their asserted dispute of fact regarding Cain's BAC, the court remains satisfied that the administrator could have reasonably concluded that Cain was heavily intoxicated at the time of his fall.

Plan also referred Cain's claim to Dr. Christopher Long, a board-certified toxicologist, who wrote a letter opining that Cain's alcohol use was a cause of his injuries. After the Plan Administrator denied Cain's appeal, plaintiffs sued EPCO in state court. EPCO then properly removed the case to this court because a federal question was presented under ERISA.

**C.    *EPCO* lawsuit**

In the initial lawsuit involving Cain's claim for benefits, the court granted summary judgment to plaintiffs, explaining that, as the then administrator, EPCO did not conduct a sufficient investigation into the circumstances surrounding Cain's fall before ruling that it resulted from his alcohol use. For example, the court found that the administrator should have arranged for an examination of the allegedly irregular stairs at Palmers' house, inquired about Cain's ability to traverse the stairs when sober, examined the footwear Cain was wearing when he fell or at least spoke to Sutton, who witnessed Cain's fall. *See EPCO*, No. 12-cv-031-wmc, slip op. at *4, *7. Ordering that the matter be remanded for further review, the court further noted that the plan administrator should clarify his interpretation of the phrase "as a result of," as found in the alcohol exclusion. *See id.* at *7 n.3.

**D.     The investigation on remand[6]**

On remand, Elizabeth Reese, the Plan's new administrator for Air Products as EPCO's successor, conducted an additional investigation into the circumstances surrounding Cain's fall.  Among other things, Reese interviewed Temple Palmer at her home on August 7, 2014, who confirmed that:  (1) no changes had been made to the stairs since they were carpeted in the late 1990s; (2) Ms. Palmer's family used the stairs on a daily basis in various types of footwear; (3) Ms. Palmer's insurance company told her that the stairs were up to code and did not cause the accident; and (4) the slippers Mr. Cain was wearing when he slipped had rubber soles and were in good condition.[7]  At Palmer's home, Reese also walked the basement stairs and took pictures of them.

The administrator next considered an expert report prepared by Kenneth Graham, Ph.D., a forensic toxicologist, who reviewed Cain's claim at the request of the administrator.   Dr. Graham opined that the "effects associated with Mr. Cain's significant alcohol intoxication were direct causes of his inability to safely negotiate the flight of stairs . . . and the subsequent injuries he sustained from his fall."  In reaching his

---

[6] On July 8, 2013, after the court remanded Cain's claim to the plan administrator for reconsideration and plaintiffs voluntarily stipulated to the dismissal of their appeal to the Seventh Circuit Court of Appeals, UWHC's counsel specifically asked Air Products who would be handling Cain's claim as the plan administrator, which set in motion correspondence between the parties that lasted until plaintiffs filed their complaint in this case on November 20, 2014, five days before the administrator issued her final decision.  As reflected in the discussion above, it appears that the administrator proceeded to do a thorough investigation in this case.

[7] Plaintiffs dispute defendant's recitation of what the administrator learned from her interview with Palmer "to the extent that [it] only summarizes a recorded interview and does not compare to the same sworn deposition taken by Mrs. Temple Palmer and incorporated into the Administrative Record at [AR 691.]"  Plaintiffs do not, however, identify any facts the administrator learned from the Palmer interview that are actually disputed in the record, nor is it apparent to the court that Palmer disputed any of them at her deposition.  Accordingly, the court finds these facts to be undisputed.

conclusion, Dr. Graham specifically dismissed the notion that Cain's personal tolerance for alcohol would have minimized the impairment of his executive functions required to navigate safely a flight of stairs.

In addition, the administrator considered more than 3,553 pages of documents that Mark Sweet, counsel for UWHC, submitted to supplement the record. Among these documents were two expert reports prepared by Dr. Richard Tovar. In the first report, Dr. Tovar concluded that after reviewing Cain's records, "[a]lthough the alcohol played a large roll in his fall, there were other factors such as potentially unfamiliar terrain such as the stairs, and the use of foot appliances, that is the slippers, which could have enhanced his lack of coordination resulting in a fall." A week after his first report, Dr. Tovar also submitted a second, in which he still opined that "the alcohol did play a role in his fall, but [a] much more decreased [role than he had first opined] in light of the new information by Ms. Sutton that Mr. Cain was a chronic drinker."

Finally, the administrator also reviewed a report plaintiffs submitted from Robert Wozniak, an engineer who examined the Palmers' basement stairs. Wozniak noted in his report that Cain's slippers were in good condition, but stated that the stairs were not up to code and may have contributed to Cain's fall.

### E.    The administrator's decision after reconsideration

In a decision dated November 25, 2014, the administrator again denied Cain's claim for benefits. Specifically, Ms. Reese found:

> The preponderance of the evidence supports that Mr. Cain's significant alcohol intoxication was the direct cause of his inability to safely navigate the flight of stairs or quickly react

to his loss of footing, was the direct cause of the subsequent injuries sustained from the fall, and that the accident would not have occurred in the absence of alcohol. Thus, medical expenses arising from such fall[s] are excluded from coverage under Item 52 of the General Limitations Section of the Plan.

In her written decision, the administrator also attempted to address the two primary concerns the court raised in the *EPCO* lawsuit. *First*, the administrator interpreted the "as a result of alcohol . . . use" coverage exclusion to mean that alcohol need *not* be *the* "but for" cause of any accident. The administrator reached this conclusion after reviewing the text of other exclusions in the Plan. She reasoned that the Plan uses "sole" or "solely" where a finding of "but for" causation is required, as opposed to "as a result of" language in the relevant provision here.

*Second*, the administrator ruled out other possible causes for Cain's fall. With respect to the condition of the basement stairs, the administrator explained that she personally walked them with no difficulty and further credited Ms. Palmer's belief that the stairs were safe. Additionally, concerning fatigue, the administrator noted that Cain had been working only six hours the day before his fall, had never fallen due to fatigue at any other time even when he worked more than six hours, and was not too tired to socialize. Finally, the administrator explained that Cain's slippers did not appear unusual, at least based on the pictures she reviewed and Ms. Palmer's statement that Cain had worn the rubber-soled slippers with no concern on other occasions.

OPINION

Because the Plan expressly grants the administrator discretionary authority to interpret its terms and determine whether claims are eligible for benefits, the parties agree that the arbitrary and capricious standard of review applies here. *See Wetzler v. Ill. CPA Soc. & Found. Ret. Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Under this deferential standard, "an administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable interpretation of the plan's language." *Id.* Only if an administrator's decision is "downright unreasonable" can the court reverse her decision. *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan*, 378 F.3d 669, 677 (7th Cir. 2004). Still, because the administrator applied a provision excluding coverage for benefits, defendant has the burden of showing that the exclusion applies. *See, e.g., Fuja v. Benefit Tr. Life Ins. Co.*, 18 F.3d 1405, 1408 (7th Cir. 1994).

The court is to consider "reasonableness" in light of the following factors: "the impartiality of the decision making body, the complexity of the issues, the process afforded the parties, the extent to which the decision makers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995). Rather than address these factors head on, plaintiffs take a scatter-shot approach to challenging the administrator's decision on remand on both procedural and substantive grounds. While keeping the applicable reasonable factors in mind, the court will address plaintiffs' arguments in turn.

# I. Procedural Challenges

To begin, plaintiffs contend that the plan administrator committed a variety of procedural errors. As plaintiffs acknowledge, those purported errors would not themselves entitle plaintiffs to a remedy or alter the standard of review. (Pls.' Opp'n Br. (dkt. #27) 13.) Instead, any procedural violations would be considered in determining whether the plan administrator's decision was arbitrary and capricious. *See Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 n.3 (7th Cir. 2011).

## A. Timing of the administrator's decision

Plaintiffs first challenge the administrator's compliance with 29 C.F.R. § 2560.503-1(f)(1), which states in pertinent part that:

> if a claim is wholly or partially denied, the plan administrator shall notify the claimant . . . of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period.

*Id.*

The parties disagree about whether this provision applies to its decision on remand. Defendant argues that the regulation provides time limits only for initial claim determinations and appeals. In reply, plaintiffs contend that because the court vacated the administrator's decision, the provision should apply. Plaintiffs' position has some support in the case law, while defendant's does not. *See Solnin v. Sun Life & Health Ins.*

*Co.*, 766 F. Supp. 2d 380, 392-94 (E.D.N.Y. 2011) (citing other case law in finding that the ERISA time regulations apply to a plan administrator's review after remand). Even if the court were to find the circumstances on remand to further investigate Cain's claim and issue her final decision justified some extension of the 90-day limit, the time it took for the administrator -- more than one year after the parties stipulated to the dismissal of plaintiffs' appeal to the Seventh Circuit and more than 300 days after plaintiffs' counsel submitted documents supplementing the administrative record -- strikes the court as unreasonable, particularly given that she was tasked with a well-defined set of responsibilities on remand.

With that being said, the plan administrator's delay here factors little into the court's determination whether her decision was arbitrary and capricious.[8] While the parties attempt to place blame on one another for the administrator's delay, whether plaintiffs' counsel or the administrator was more culpable, the record reflects that plaintiffs share some responsibility for the extended period of time it took for the administrator to issue her decision. For instance, plaintiffs concede that their counsel: (1) requested, and was granted by the administrator, two multi-week extensions for time to supplement the administrative record (Pls.' Resp. to Def.'s PFOF (dkt. #28) ¶¶ 46, 51); (2) on multiple occasions acknowledged his delay in responding to the administrator's requests (*id.* at ¶¶ 53, 58, 59); and (3) submitted 3,553 pages of

---

[8] Defendant points out that amendments to the ERISA regulations that removed the "deemed denied" language suggest that a plan administrator retains her discretionary authority in making her final determination even when an administrator's delay results in all administrative remedies being deemed exhausted. *See Wedge v. Shawmut Design and Constr. Grp. Long Term Disability Plan*, No. 12 Civ. 5645(KPF), 2013 WL 4860157, at *7 (S.D.N.Y. Sept. 10, 2013).

documents for the administrator to review (*id.* at ¶ 55). At most, the record indicates not that the administrator dragged her feet on Cain's claim, such that her delay should weigh heavily toward a finding that her decision was arbitrary and capricious, but rather that both she and plaintiffs' counsel did not consider handling Cain's claim on remand to be an urgent matter. Accordingly, while a consideration favoring plaintiffs, the court will not penalize the administrator substantially for the delay in issuing her decision on remand.

**B.      Dr. Graham's CV**

Plaintiffs contend, and defendant does not dispute, that the administrator did not provide Dr. Graham's credentials in the form of his *curriculum vitae* ("CV") during the course of reconsideration of Cain's claim. Plaintiffs argue this failure renders the administrator's decision unreasonable, because they had no opportunity to challenge Graham's fitness as an expert.

As an initial matter, plaintiffs cite no case law suggesting that a plan administrator must provide a claimant with an expert report, let alone expert's qualifications, before the administrator reaches a final decision. To the contrary, the ERISA regulations only contemplate that following the issuance of an adverse decision by the plan administrator, a claimant be given the opportunity to "review and rebut medical opinions generated on administrative appeal." *See Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 895 (8th Cir. 2009); *see also Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007) (stating that holding otherwise "would set up an unnecessary cycle of submission, review, re-submission, and re-review"); *Glazer v. Reliance Std. Life Ins.*

*Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) ("Documents produced before a decision is made would not assist a claimant in deciding whether to pursue an appeal because the claimant would not yet know if there has been an adverse determination."). Accordingly, the plan administrator cannot be faulted for not allowing plaintiffs to challenge Dr. Graham's report while Cain's claim was pending on remand.

On the other hand, as plaintiffs insist, there is room to argue that they were deprived a full and fair review when there is nothing in the administrative record establishing the qualifications of an expert on whose opinion a plan administrator relied. The Seventh Circuit has repeatedly stated that the "persistent core requirements" of full and fair review include "having an opportunity to address the accuracy and reliability" of evidence upon which the decision-maker relied. *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 690 (7th Cir. 2004). Moreover, defendant's explanation for the absence of Graham's qualifications is underwhelming. It may be true that, as defendant asserts, plaintiffs' effort to strike Dr. Graham's report from the record fails because Federal Rule of Evidence 702 and the *Daubert* standard do not bind a plan administrator, but that says little about whether plaintiffs were ultimately afforded a meaningful opportunity to challenge the minimum procedure they are guaranteed.

As with the delay before the administrator issued her decision, plaintiffs share some responsibility for the uncertainty regarding Dr. Graham's qualifications. Although they maintain that "[d]efendant refused to agree to discovery in the parties['] joint pretrial report" (Pls.' Reply Br. (dkt. #38) 3), it is not clear that they specifically requested discovery as to Graham's qualifications, as the parties' joint preliminary

pretrial conference report merely states that "Plaintiffs desire discovery into . . . the Plan's expert, Dr. Kenneth Graham." (Joint Prelim. Pretrial Conference Report (Dkt. #10) 5.) Even assuming that defendants did reject plaintiffs' specific proposal for limited discovery into Dr. Graham's qualifications, plaintiffs could have asked the court to resolve the parties' dispute. By deciding to forego reasonable efforts to seek information about Dr. Graham's qualifications through discovery, plaintiffs again bear some responsibility for the record being incomplete.

In support of their challenge to Dr. Graham's report, plaintiffs argue that the absence of his CV in the administrative record fatally undermines the administrator's decision because the letterhead on his report does not constitute substantial evidence adequate to support his purported credentials as an expert forensic toxicologist. Plaintiffs also cite *White v. Airline Pilots Association, International*, 364 F. Supp. 2d 747 (N.D. Ill. 2005), which found a plan administrator's decision was arbitrary and capricious. In *White*, the district court stated:

> It is true that seeking independent expert advice is evidence of a thorough investigation. However, in order for that expert advice to have any credible weight, the insurer must "investigate the expert's background, provide the expert with complete and accurate information, and determine that reliance on the expert's advice is reasonably justified under the circumstances."

*Id.* at 765 (internal citations omitted) (quoting *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998)). The *White* court went on to hold that remand was unnecessary because the record clearly favored plaintiffs, and because the insurer's review, in relying heavily on a medical expert with whom it did not provide important

information and restricted the expert from speaking with the treating physician, was "patently unreasonable." *See id.* at 765-66.

Here, the facts are more analogous to those in *Grossman v. Wachovia Corp.*, No. Civ.A. 04-3701, 2005 WL 2396793 (E.D. Pa. Sept. 27, 2005). In that case, the district court stated that it "acknowledges that it is suspect that Defendants' counsel has failed to provide Plaintiff and the Court with [the medical expert's] CV." *Id.* at *8. Still, the *Grossman* court found that "Defendant Liberty's reliance on a physician with suspect qualifications goes to whether Defendant Liberty acted arbitrarily and capriciously, and is not a procedural irregularity warranting a heightened standard of review[.]" *Id.* Accordingly, while the court faults defendant for failing to supplement the record with Dr. Graham's CV, without a suggestion that Dr. Graham is *not* qualified to offer an expert opinion about the extent to which alcohol use played a role in Cain's fall, the absence of Graham's CV in the record does not compel a heightened standard of review, although it is a consideration under the process, along with the delay, in evaluating whether the administrator's decision was arbitrary and capricious.[9]

---

[9] While the court limits its review to the evidence that was before the administrator when she made her decision, *see Gutta v. Standard Select Tr. Ins. Plans*, 530 F.3d 614, 619 (7th Cir. 2008), from the limited information available in the record (namely, the letterhead of his report reflecting his address in Phoenixville, Pennsylvania (AR 4272)), it appears that Dr. Graham has the requisite specialized experience to qualify him as an expert. *See* DUI: Effects of Alcohol on Metabolism Webinar, The TASA Group, http://www.tasanet.com/knowledgeCenterDetails.aspx?docTypeID=3&docCatID=6&docID=256 (last visited April 30, 2018) ("Kenneth D. Graham, Ph.D. is an independent forensic toxicologist and pharmacologist located in suburban Philadelphia, Pennsylvania.").

## II.    Substantive Challenges

Plaintiffs' additional substantive challenges to the administrator's denial of benefits fall into four categories:  (1) the administrator's interpretation of "as a result of" was so incomplete as to be unreasonable; (2) her interpretation of that phrase is also unreasonable because it brings the alcohol exclusion into conflict with another provision in the Plan itself; (3) Dr. Graham's report was so flawed as to make the administrator's reliance on it unreasonable; and (4) the administrator's reliance on her personal assessment of the safety of the stairs was unreasonable.  For the reasons that follow, the court finds none of these categories, even when considered altogether, along with the process considerations, rise to the level of arbitrary and capricious.

## A.    Interpretation of the alcohol exclusion

Plaintiffs argue that the administrator's interpretation of "as a result of" is inconsistent with the court's directions on remand, rendering it unreasonable for failing to define what degree of causation is *sufficient* to apply the exclusion.  Put differently, plaintiffs argue that the administrator's determination that alcohol need not be a "but for" cause is "arbitrary and capricious because while it establishes an *upper* limit (i.e., not but for causation), it does not give a lower threshold."  (Pls.' Opp'n Br. (dkt. #27) 6 (emphasis added).)

In this court's initial review and remand, the administrator had defined "as a result of" to mean that alcohol use was "a cause or substantial cause" of the injury. *EPCO*, No. 12-cv-031-wmc, at *6-7.  The court remarked that this interpretation was not arbitrary on its face, provided that "cause" meant "actual cause," rather than simply

meant "to make the injury more likely in the abstract."  *Id.* at *7 (internal quotation marks omitted).  The court added:

> On the other hand, the [alcohol exclusion] does not say "*the* result of," arguably suggesting that more than one factor may contribute to the injury.  The plan administrator does not explain which of these interpretations he adopted, and why, nor will the court do so in the first instance given that a remand is required for further inquiry into the accident's cause in any event.

*Id.* at *7 n.3 (emphasis in original).

On remand, the administrator looked at the text of other exclusion provisions in the Plan that required her to evaluate causation in order to determine "how closely connected the cause must be to the effect [under the alcohol exclusion]."  (AR 4260-61.)  Observing that the plan uses "sole" or "solely" where the administrator must find a but for cause, she concluded that alcohol use need not be the but for cause of Cain's injury.  (*Id.* at 4261.)  Nevertheless, in her decision, the administrator concluded that:  Cain's alcohol use was "the direct cause" of his fall and resulting injuries; and "the accident would not have occurred in the absence of alcohol."  (*Id.* at 4264.)

Plaintiffs' attempt to paint the administrator's interpretation of the relevant plan language as arbitrary and capricious by attempting to distinguish between an upper and lower bounds of causation is mainly sophistry.  As an initial matter, the deferential arbitrary and capricious standard applies to the administrator's interpretation because the Plan grants her sole authority to interpret its terms.  *See Marrs v. Motorola, Inc.*, 577 F.3d 783, 786 (7th Cir. 2009).  Moreover, neither the Plan nor the court required the administrator to interpret "as a result of" to the level of specificity to which plaintiffs

now argue, nor does that phrase lend itself to such precision. On the contrary, the court previously rejected plaintiffs' contention that it would be arbitrary and capricious for the plan to apply the alcohol exclusion when other factors "may have contributed to [Cain's] fall." *EPCO*, No. 12-cv-031-wmc, at *10 n.5.

While plaintiffs correctly point out that it is not their responsibility to provide an interpretation of the alcohol exclusion to the administrator, they tellingly offer no *example* of what they would consider a reasonable interpretation with both an "upper limit" and a "lower threshold" of causation. Regardless, on remand, the administrator appropriately looked at the text related to causation in other exclusion provisions of the Plan, and she reasonably concluded that alcohol use need not be *the* "but for" cause of Cain's fall. To be fair, the administrator could have been more specific in her decision -- adopting something akin to the alternative interpretation that the court discussed in *EPCO* (alcohol use was the actual or substantial cause of Cain's fall) -- but her decision makes clear that she adopted a defensible standard and found after applying the facts that Cain's fall well exceeded that necessary to be subject to exclusion, particularly given the deference that the administrator is owed.

Accordingly, the court cannot hold that the administrator's interpretation of the alcohol exclusion is arbitrary and capricious.

## B.  Conflict with another provision

Plaintiffs purport to raise an additional challenge to the administrator's interpretation of the alcohol exclusion, although as set forth in the direct passage setting

forth their argument below, it reads as more of a rule of construction than a basis to finding that defendant's interpretation was arbitrary and capricious:

> UWHC contends that the administrator's interpretation of the alcohol exclusion is unreasonable because it would both vitiate other coverage provisions in the Plan and, in turn, take the Plan out of compliance with the Mental Health Parity and Addiction Equity Act of 2008 [MHPAEA]. The Plan specifically provides for counseling benefits, including an express provision governing alcohol and substance abuse problems. Because such services would directly result from alcohol use, there would be no such coverage available. *See, e.g., Costantino v. Wash. Post Multi-Option Benefits Plan*, 404 F. Supp. 2d 31, 42 (D.D.C. 2005) (appropriate to consider whether interpretation is reasonable based on, among other factors, whether the interpretation renders other provisions of the plan superfluous).
>
> This would read out of the plan the following relevant provision [describing eligible expenses]:
>
> . . . .
>
> Charges in relation to individual and group Psychiatric Care (treatment of a psychiatric condition, alcoholism, substance abuse or drug addiction). A psychiatric condition includes but is not limited to anorexia nervosa and bulimia, schizophrenia, and depressive disorders including but not limited to manic depression.
>
> . . . .
>
> Indeed, this Plan even limits the exclusion of self-inflicted injuries to those *unrelated to a mental or physical condition*.[10]
>
> Another result would be the differential treatment of various forms of mental health counseling as counseling not directly cause[d] by alcohol or drug use would still be covered. Such differentiation calls into question the Plan's compliance with

---

[10] The actual language of the Plan provides an exclusion for: "[c]harges in relation to self-inflicted Injury or self-induced Illness, unless the result of a medical condition whether mental or physical." (Pls.' Reply PFOF (dkt. #39) ¶ 26.)

the Mental Health Parity and Addiction Equity Act of 2008 ["MHPAEA"]. *See, e.g, Coalition for Parity, Inc. v. Sebelius*¸709 F. Supp. 2d 10 (D.D.C. 2010) (discussing Act and its effort to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in health plans).

(Pls.' Opening Br. (dkt. #33) 5-6 (emphasis in original) (internal citation omitted).)

Before getting to the substance of plaintiffs' argument, defendant raises its own procedural hurdle, arguing that plaintiffs' waived the right to advocate for an alternate interpretation by failing to assert it before the administrator issued her decision. While the court agrees this would have certainly been preferable, rather than arguably waiting in the wings, the court is disinclined to find waiver, especially when defendant has had an opportunity to defend its interpretation now. As to the merits of plaintiffs' challenge to the administrator's interpretation of "as a result of" in the alcohol exclusion as overbroad and in conflict with other Plan provisions, the court finds little merit. In their reply brief, plaintiffs' final effort to present their argument illustrates how strained the argument is:

> To use a different hypothetical, assume Mr. Cain sought treatment for liver problems and that his physician determined he had developed cirrhosis of the liver because of alcohol use. Presumably, under the Plan administrator's interpretation of the alcohol exclusion, Mr. Cain would not be entitled to payment of his health expenses related to this illness upon a finding it was directly related to alcohol use.

(Pls.' Reply Br. (dkt. #38) 5.)

Contrary to the suggested conflict in this example, the plain meaning of the Plan language making eligible for coverage expenses related to "treatment of . . . alcoholism" is in no meaningful tension with the exclusion language her for expenses related to "accidental bodily Injury sustained or Illness contracted as a result of alcohol or drug

use."  First, *treatment for alcoholism* cannot reasonably be read as equivalent to accidental *injury or illness resulting from alcohol use*.  Second, even if mental and physical treatment for the long-term ravages of alcoholism were intended to be covered by this provision, rather than treatment of alcoholism as a disease itself, "accidental injury or illness" contemplates by its terms the sudden or unexpected event precipitated by a fall and not the slow deterioration of mind and body from the deliberately destructive drinking over decades.

The other provision plaintiffs reference is even more of a stretch:  "alcohol use" in the exclusion cannot reasonably be read as a "medical condition whether mental or physical."  Regardless, the administrator could conceivably either provide *or* deny coverage for treatment of liver problems related to cirrhosis without doing any violence to her interpretation of the alcohol exclusion.  Finally, resolving plaintiffs' hypothetical is unnecessary because they have not demonstrated that the administrator's interpretation of the alcohol exclusion under the facts of this case conflicts with the provisions to which they refer.  Indeed, even construing plaintiffs' arguments generously, the court can find nothing about the administrator's interpretation of the alcohol exclusion for accidental injury or illness that puts it in conflict with other provisions of the Plan without extremely straining the plain meaning of the Plan's language.  Nor is this a role the court can take on under the deferential standard due the plan's administrator here.  *See Sisters of the Third Order of St. Francis v. SwedishAmerican Grp. Health Benefit Tr.*, 901 F.2d 1369, 1372-73 (7th Cir. 1990).  In short, because plaintiffs have not shown that the

administrator's interpretation affects other provisions of the Plan, they cannot demonstrate that it does not comply with ERISA as amended by MHPAEA.

## C.      The Cromer Study

Next, plaintiffs contend that the administrator's reliance on Dr. Graham's report renders her decision arbitrary and capricious because he supposedly misinterpreted one of the medical studies on which he relied.   Specifically, plaintiffs asks the court to take judicial notice of four material facts about "the Cromer Study," which they then suggest do not squarely apply to Cain's fall:

> 1) The study examined the effects of alcohol on "executive functions," defined in the study as the tasks that "require complex decision making or problem solving."
>
> 2) The study did not measure balance while intoxicated.
>
> 3) The study did not measure coordination while intoxicated.
>
> 4) The study specifically excluded heavy drinkers.

(Pl.'s Opening Br. (dkt. #13) 19-20 (footnotes omitted).)   Plaintiffs stress the first and last facts, claiming that the Cromer Study is inapplicable because Cain *was* a heavy drinker and traversing stairs is *not* an executive function as defined by the study.

Even crediting all four facts to be true, *and* that doing so establishes that the Cromer Study was largely, if not completely, inapplicable to the circumstances surrounding Cain's fall, however, is different than showing that *Dr. Graham's* findings were generally suspect.   Without evidence that Graham relied so heavily on the Cromer Study as to make Graham's conclusions entirely unreliable, it is far from apparent that Dr. Graham's reliance on the Cromer Study is fatal to defendant.   Additionally, to the

extent that plaintiffs contend the administrator should have credited their expert, Dr. Tover, over Dr. Graham, the court must defer to the administrator's choice because evidence in the record supports Dr. Graham's conclusion. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009) ("[W]e must defer to [the insurer's] choice between medical opinions so long as it is rationally supported by record evidence."). Admittedly, when uncertainty about Dr. Graham's specific qualifications is combined with his apparent reliance on a distinguished study, the question is closer than it ought to be. Even so, the court still cannot find the administrator's decision is "downright unreasonable." *Blickenstaff*, 378 F.3d at 677.

### D.     The administrator's personal assessment of the stairs

Finally, plaintiffs argue that the administrator failed to sufficiently "rebut the expert testimony by Mr. Wozniak indicating that the condition of the stairway may have contributed to Mr. Cain's falling, along with other factors then existing including his intoxication." (Pls.' Reply Br. (dkt. #22) 6.) The core of plaintiffs' argument is that it is unreasonable for the administrator to credit her personal, lay assessment of the basement stairs in the face of a report about the stairs prepared by an engineering expert. As an initial matter, it is not obvious why the administrator might not be allowed to rely on her own investigation of the stairs, or to conclude that any irregularity in the stairs was not enough to account for Cain's fall, especially when this is a matter that would appear to rest comfortably within the life experience of a lay person. *Cf. Taylor v. Ill. Cent. R.R. Co.*, 8 F.3d 584, 585-86 (7th Cir. 1993) ("This issue . . . boils down to whether a pile of large rocks is harder to stand on than a pile of smaller rocks. Notwithstanding [the purported

expert's] lengthy experience in the railway industry, any lay juror could understand this issue without the assistance of expert testimony.").

In fairness, defendant offers no response to plaintiffs' argument to the contrary, but this does not mean plaintiffs were denied a full and fair review of the administrator's decision, especially when plaintiffs' expert merely concluded:

> the condition and design of the Palmer residence stairway *may have* contributed to Mr. Cain's stairway fall accident. Had a stairway fall occurred on the Palmer basement stairway without the involvement of alcohol I would still hold the opinion that the condition and design of the stairway *may have* contributed to a stairway fall.

(AR 3524 (emphasis added).) Accordingly, even if the administrator were required to credit Wozniak's report, her reaching the same decision on Cain's claim would not necessarily have been arbitrary and capricious.[11]

## III.   Discovery Regarding Conflict of Interest

In the alternative to reversal, plaintiffs also argue that summary judgment for defendant is still premature because discovery into the circumstances surrounding a possible conflict of interest is necessary. A plan administrator's conflict of interest must be weighed in determining whether she abused her discretion. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (internal citations and quotation marks omitted). Plaintiffs represent that the *extent* to which the administrator had a conflict of interest remains unknown, although they do suggest a conflict exists because: (1) the Plan both determines eligibility for benefits and pays benefits out of its own pocket; (2) the

---

[11] In addition, Ms. Palmer told the administrator that her insurance company found that the stairs were up to code and did not cause the accident.

administrator is an employee of Air Products; and (3) the Plan is "subject to stop-loss coverage issued by SISCO." (Pls.' Opp'n Br. (dkt. #27) 12.) Because Cain's claim exceeds $500,000, plaintiffs argue, "discovery of the exposure of the plan versus its stop-loss carrier is unknown and highly relevant to the Plan's potential exposure[.]" (*Id.*)

Defendant acknowledges that a conflict of interest exists because the Plan both determines eligibility for benefits and pays them, but emphasizes that the conflict should weigh little into the court's analysis because it is a large corporation that can easily absorb Cain's claim for benefits. *See Mers v. Marriott Int'l Grp. Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1020-21 (7th Cir. 1998) ("The impact of granting or denying [$200,000 of] benefits in this case is miniscule compared to AIG's bottom line."); *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1344 (7th Cir. 1995) ("[Quaker] is a corporation which generates revenues of nearly $6 billion annually and is therefore not likely to flinch at paying out $240,000.").

While Cain's claim for benefits may exceed $500,000 (Pls.' Opening Br. (dkt. #13) 2), even with Wisconsin's cap on loss of life damages, the record indicates that Air Products is ranked number 276 on the Fortune 500 list, and it enjoyed $10.4 billion in sales in 2014 (Aff. of Meredith Degner, Ex. 1 (dkt. #15-1) 1), making it unlikely that the administrator's decision to grant or deny benefits would have more than a miniscule impact on Air Products' bottom line, assuming it could even be held liable directly. Less clear, however, are the effects on the Plan's funds or on the administrator.[12]

---

[12] Plaintiffs leave unclear whether they believe the Plan's stop-loss provision applies, which they state "would cap the amount paid out for Cain's claim from the general assets of EPCO," creates a conflict of interest concern. (Pls.' Opening Br. (dkt. #33) 7.) If true, the stop-loss provision

The Seventh Circuit has recognized that conflicts of interest for plan administrators exist in degrees, remarking that "[i]t is [] not the existence of a conflict of interest -- which is a given in almost all ERISA cases -- but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Marrs*, 577 F.3d at 789. Having neither sought from this court an order compelling production of, nor presenting evidence that the administrator labored under a conflict of interest sufficient to call into question the reasonableness of her decision, plaintiffs are not entitled to another opportunity to take discovery.[13] *See Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814-15 (7th Cir. 2006) (announcing that the standard for a claimant to seek limited discovery into a conflict of interest "presents a high bar for individuals whose claims have been denied by a plan administrator with discretionary authority."); *see also Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 747 (7th Cir. 2013) (acknowledging a "softening, but not a rejection, of the standard announced in *Semien*").

## ORDER

IT IS ORDERED that:

1) Plaintiffs University of Wisconsin Hospital and Clinics, Inc. and University of Wisconsin Medical Foundation, Inc.'s motion for judgment on the pleadings (dkt. #12) is DENIED.

---

would only seem to limit Air Product's exposure to Cain's claim and thereby further diminish its conflict of interest.

[13] As with the issue concerning Dr. Graham's CV, plaintiffs took the risk that the court would deny their prayer for discovery when they decided not to serve discovery requests on defendant or, if necessary, involve the court in a discovery dispute between the parties. Indeed, they concede as much by stating that "[o]nce dispositive motions were filed, there was no reason to press the discovery issue given the possible resolution on the record." (Pls.' Reply Br. (dkt. #38) 6.)

2) Defendant Air Products and Chemicals, Inc.'s motion for summary judgment (dkt. #18) is GRANTED.

3) Plaintiffs' motion to stay the proceedings (dkt. #24) is DENIED as moot.

4) Plaintiffs' motion for partial summary judgment (dkt. #32) is DENIED.

5) The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 1st day of May, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge